# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**OUR ALCHEMY, LLC,** *et al.*<br><br>Debtors. | CHAPTER 7<br><br>Case No. 16-11596-KG<br><br>Jointly Administered |
| **GEORGE L. MILLER, in his capacity as Chapter 7 Trustee for the jointly administered bankruptcy estates of Our Alchemy, LLC and Anderson Digital, LLC,**<br><br>**Plaintiff,**<br><br>v.<br><br>**MORGAN STANLEY SENIOR FUNDING, INC.,**<br><br>**Defendant.** | Adv. No. _____ |

## COMPLAINT

Plaintiff George L. Miller ("Plaintiff" or the "Trustee"), as the Chapter 7 Trustee for the jointly administered bankruptcy estates of Our Alchemy, LLC ("Alchemy") and Anderson Digital, LLC (collectively with Alchemy, the "Debtors"), by and through his undersigned counsel, files this Complaint against Defendant Morgan Stanley Senior Funding, Inc. ("Morgan Stanley"), and in support thereof asserts as follows:

### The Parties

1.  Plaintiff George L. Miller is the duly appointed Chapter 7 Trustee of the bankruptcy estates (the "Estates") of the Debtors. The Trustee maintains an office at Miller Coffey Tate LLP, 8 Penn Center, Suite 950, 1628 John F. Kennedy Boulevard, Philadelphia, Pennsylvania 19103.

2.  Defendant Morgan Stanley Senior Funding, Inc. is a Delaware corporation with its executive offices located at 1585 Broadway, New York, New York 10036.

## Jurisdiction and Venue

3.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, and Federal Rule of Bankruptcy Procedure 7001, since the litigation arises under Title 11 of the United States Code, or in or related to cases under Title 11.

4.  The Trustee demands a jury trial before an Article III judge in connection with the claims asserted herein, and the Trustee does not consent to the entry of final judgment or adjudication by a bankruptcy judge.

5.  Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

## I.  FACTUAL BACKGROUND

6.  Alchemy, previously known as Millennium Entertainment, was an independent distributor of film and television content across all platforms in North America, including DVD, digital, and video-on-demand platforms. In July of 2015, Alchemy agreed to purchase certain physical home video and digital distribution capabilities from ANConnect, LLC, including, *inter alia*, the purchase of Debtor Anderson Digital, LLC.

7.  On or around June 1, 2016, Alchemy retained Morgan Stanley to assist Alchemy in obtaining proposed senior secured priming debtor-in-possession financing or exit facility (the "Financing"). The purpose of the Financing was, *inter alia*, to provide Alchemy with working capital for a potential chapter 11 bankruptcy filing.

8.  Pursuant to the terms of Alchemy's engagement of Morgan Stanley, Morgan Stanley was required to, *inter alia*, undertake a due diligence review and consider providing the

Financing as the initial lender and to use its commercially reasonable efforts to arrange the Financing.

9. On or about June 2, 2016, in accordance with the terms of Morgan Stanley's retention, Alchemy paid a non-refundable work fee to Morgan Stanley in the amount of $150,000.00 (the "Work Fee") and deposited $75,000.00 (the "Expense Deposit") with Willkie Farr & Gallagher LLP ("WFG") as a deposit to be applied by Morgan Stanley for Morgan Stanley's expenses relating to its retention. Morgan Stanley's expenses in excess of the Expense Deposit, up to the additional amount of $50,000.00, were to be paid from supplemental deposits made to WFG.

10. On or about June 24, 2016, Anderson Digital, LLC made two $25,000.00 transfers (the "Supplemental Deposits") one to Morgan Stanley and one to WFG as supplemental expense deposits.

11. On June 28, 2016, less than a month after being retained, Morgan Stanley terminated its retention by Alchemy and retained the $150,000.00 Work Fee, the $75,000.00 Expense Deposit, and the $50,000.00 Supplemental Deposits (collectively, the "Transfers"). A listing of the details for each of the Transfers is attached hereto as Exhibit A.

12. On July 1, 2016 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware, and the cases are being jointly administered under the caption *In re Our Alchemy, LLC, et al.*, U.S.B.C. D. Del., Case No. 16-11596-KG.

13. Morgan Stanley failed to obtain the Financing, which was the purpose for which Morgan Stanley was retained by Alchemy and why the Debtors made the Transfers to Morgan Stanley. Upon information and belief, Morgan Stanley did not make any meaningful progress in assisting Alchemy in obtaining the Financing.

14. Upon information and belief, Morgan Stanley failed to make commercially reasonable efforts to arrange the Financing.

15. The Trustee alleges that the services provided by Morgan Stanley to Alchemy failed to meet the requirements of Morgan Stanley's retention by Alchemy and that the payment of the Work Fee, Expense Deposit, and Supplemental Deposits constitute fraudulent transfers. Alternatively, the Trustee asserts that the Supplemental Deposits constitute preferential transfers. Accordingly, the Trustee seeks to: (a) avoid and recover as fraudulent Transfers the $275,000.00 in fees and expenses paid to Morgan Stanley; and, alternatively, (b) avoid and recover as preferential transfers the $50,000.00 in payments made by Anderson Digital, LLC, for the benefit of Alchemy, to Morgan Stanley in the days leading up to the Debtors' bankruptcy filing.

**Alchemy Was Insolvent When It Made the Transfers**

16. Liquidity and cash flow were ongoing concerns at Alchemy in the months leading up to the July 2015 closing on the ANConnect Transaction, as the following documents and facts demonstrate:

   a. A January 19, 2015 email from then- CEO Bill Lee including "liquidity" among a list of concerns about the business;

   b. Alchemy's failure to pay Nu Image, Inc. licensing fees as they came due, starting as early as February 27, 2015 and continuing thereafter;

   c. An April 27, 2015 email from Bill Lee describing the SunTrust situation – i.e., the ability to put Alchemy in further debt to keep it afloat – as "Life or death!";

   d. A May 12, 2015 email from Mark Perez to Bill Lee and Jesse Watson describing Alchemy's "cumulative liquidity need" and noting that Alchemy's continued viability was dependent on Virgo's ability to continue injecting cash into the business;

e.  A May 15, 2015 email from Senior VP Jim Jenkins stating that Alchemy was desperately maneuvering towards "keeping out of debtor's prison";

f.  A May 15, 2015 document emailed by Bill Lee to Judd Taylor listing "working capital" as one of the key issues impacting the contemplated ARC Transaction (defined below);

g.  A May 25, 2015 email from Mark Perez stating that "liquidity is an important area to get right and probably easiest to discuss in person";

h.  A May 27, 2015 email from Jesse Watson to Bill Lee, Mark Perez, and Todd Dorfman acknowledging the need to resort to "back up plans" for liquidity and questioning whether they were "cutting it too close," a reference to Virgo's operation of Alchemy on a shoestring following the Calrissian Distribution;

i.  A June 5, 2015 email from SVP for Business and Legal Affairs Olivia Lerner stating that, due to ongoing issues with paying its vendors on time, Alchemy was "trying to urgently get positive trade references to a company called D&B," and that to do so certain favored vendors would have to be "called and buttered up";

j.  On June 22, 2015, Alchemy defaulted on a $1,000,000 payment due to Toiion, Inc. in connection with the release of an animated picture known as "Dino Time";

k.  A June 24, 2015 email from the co-President of PBSS Distribution to Bill Lee describing "continued problems with getting paid" by Alchemy dating back to March 2015;

l.  A June 25, 2015 email from Anderson Digital co-founder Freyr Thor to Bill Lee stating that "the Alchemy world is spinning at high velocity, we are all working hard to keep it under control";

m.  Alchemy's failure to pay nearly $4.4 million owed to FUNimation Productions, Ltd. for DVDs ordered during the first half of 2015.

17. Disputes between Alchemy and a number of its creditors over unpaid debts had also arisen in the months leading up to the ANConnect Transaction, including a dispute with Nu Image, Inc. (Alchemy's former majority owner) over amounts owed under various licensing agreements.

18. Just one day after Closing of the APA, on July 10, 2015, Bill Lee emailed a list of "Alchemy priorities," which listed "liquidity/cash management" as one of Mark Perez's main concerns about Alchemy, and listed "[m]anage[ment] [of] negative $5M working capital requirement through September" as Lee's top priority.

19. Almost immediately after the Closing, creditors were contacting Alchemy demanding payment, and within a matter of weeks, Alchemy was in the midst of a crippling liquidity crisis and was unable to meet its obligations as they became due.

20. Contemporaneous communications establish the point, including:

a.  a July 13, 2015 email in which Alchemy's CFO considers paying Steve Lyon's severance "over a period of time" because Alchemy is "looking for short term liquidity improvement options"; and

b.  an August 17, 2015 email in which an Alchemy consultant and Alchemy's HR Director discuss a conversation regarding the consultant's past due invoices and states that SVP for Business and Legal Affairs Olivia Lerner told her as a personal favor that, unless she received pre-payment for services rendered to Alchemy, then she should refuse to perform them.

21. In the words of Anderson Digital co-founder Stephen Lyons, it was immediately apparent that "Alchemy's acquisition of Anderson Digital's parent company has been an

operational and financial disaster," which left Alchemy "experiencing serious trouble meeting its financial obligations as they come due, [including obligations] to vendors and suppliers which are critical to the company's continued existence." The transaction left the already distressed Alchemy in a state of "financial triage, picking and choosing which of its creditors it will pay," and having difficulty making timely lease and license payments. Lyons was also informed on at least two occasions – including in November 2015 by then-CEO Bill Lee and in February 2016 by Mark Perez – about the Debtors' cash flow problems.

22. In a February 12, 2016 email discussing a debt of over $3 million owed to Group 1200 (one of Alchemy's former suppliers), Alchemy Co-President Kelly Summers described the company's dire financial status to Mark Perez, stating: "Payment plans is all we can offer … But until I see what our cash flow looks like it's hard to say whether that's something we can honor. […] We have many other payables affecting our current ability to produce near-term revenue." Summers went on: "As you know we are losing product flow from existing suppliers, we have effectively shut down all business development & acquisition activity, and planned titles are in trouble of meeting street date due to unpaid vendors and work stoppage. Our pipeline is dying."

23. Per a Confidential Information Memorandum prepared in connection with Alchemy's unsuccessful attempt to obtain a $70 million debt recapitalization, in April 2016 Alchemy was "burdened with an estimated $22.4 million of legacy liabilities related to the ANconnect transaction and transition plus payables 'overhang' from the historical acquisitions business." Those "legacy liabilities" (*i.e.*, the liabilities Alchemy assumed from ANConnect) accounted for approximately 50% of Alchemy's total liabilities at that time.

## II.   CLAIMS FOR RELIEF

### FIRST CLAIM – AVOIDANCE AND RECOVERY OF TRANSFERS
### Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550

24. The preceding paragraphs are incorporated by reference, as if fully set forth herein.

25. The Trustee seeks to avoid the Transfers and recover the value of each from Morgan Stanley.

26. Each of the Transfers was a "transfer" within the definition of 11 U.S.C. § 101(54)(D)(i) or (ii).

27. The Transfers occurred within thirty (30) days of the Petition Date.

28. Each of the Transfers was a transfer of property, or an interest in property, of one of the Debtors to and/or for the benefit of Morgan Stanley.

29. As set forth above, Alchemy did not receive reasonably equivalent value in exchange for the Transfers.

30. The Transfers were made at a time when the Debtors were insolvent, had unreasonably small capital, and/or had incurred (or intended to incur) debts beyond their ability to pay as such debts matured.

31. Accordingly, the Transfers constitute avoidable fraudulent transfers pursuant to Section 548(a)(1)(B) of the Bankruptcy Code.

32. Morgan Stanley was the initial transferee of the Transfers, or the entity for whose benefit the Transfers were made, or, alternatively, the immediate or mediate transferee of such initial transferee.

33. Accordingly, the Trustee is entitled to recover the Transfers or their value pursuant to Section 550 of the Bankruptcy Code.

## SECOND CLAIM – AVOIDANCE AND RECOVERY OF TRANSFERS
### Pursuant to 6 Del. C. §§ 1304(a)(2) and 1305(a), and 11 U.S.C. §§ 544 and 550

34. The preceding paragraphs are incorporated by reference, as if fully set forth herein.

35. At all times material hereto, the Debtors had at least one creditor prior to making the Transfers.

36. At all times material hereto, the Debtors were insolvent (or rendered insolvent as a result of the Transfers), had unreasonably small capital, and/or had incurred (or intended to incur) debts beyond their ability to pay as such debts matured.

37. The Debtors did not receive reasonably equivalent value in exchange for the Transfers.

38. Accordingly, the Transfers constitute avoidable fraudulent transfers pursuant to 6 Del. C. §§ 1304(a)(2) and 1305(a), and Section 544 of the Bankruptcy Code.

39. Morgan Stanley was the initial transferee of the Transfers, or the entity for whose benefit the Transfers were made, or, alternatively, the immediate or mediate transferee of such initial transferee.

40. Accordingly, the Trustee is entitled to recover the Transfers or their value pursuant to Section 550 of the Bankruptcy Code.

## THIRD CLAIM – AVOIDANCE AND RECOVERY OF TRANSFERS
### Pursuant to 11 U.S.C. §§ 547(b) and 550

41. The preceding paragraphs are incorporated by reference, as if fully set forth herein.

42. Within the ninety (90) days prior to the Petition Date (April 1, 2016 through June 30, 2016 (the "Preference Period")), Anderson Digital, LLC made two transfers (the

9

"Preferential Transfers") to, or for the benefit of, Morgan Stanley in the total amount of $50,000.00. *See* Exhibit A.

43. During the Preference Period, Morgan Stanley was a creditor of Alchemy within the meaning of Section 547(b)(1) of the Bankruptcy Code at the time of each of the Preferential Transfers by virtue of its alleged right to compensation for costs and expenses incurred in the alleged furtherance of Alchemy obtaining the Financing.

44. The Preferential Transfers were transfers of an interest in Anderson Digital, LLC's property.

45. According to Anderson Digital, LLC's books and records, the Preferential Transfers were made to, or for the benefit of, Morgan Stanley because each Preferential Transfer either reduced or fully satisfied a debt or debts then owed by Alchemy to Morgan Stanley.

46. The Preferential Transfers were made for or on account of antecedent debts owed to Morgan Stanley by Alchemy.

47. The Preferential Transfers were made while the Debtors were insolvent. The Trustee is entitled to the presumption of insolvency for each Preferential Transfer made during the Preference Period pursuant to Section 547(1) of the Bankruptcy Code. Further, as evidenced by, among other things: (i) the Debtors' bankruptcy petitions; and (ii) the proofs of claim that have been filed against the Debtors' Estates, the Debtors' liabilities exceeded the value of their assets during the Preference Period.

48. The Debtors' general unsecured creditors will receive less than full value on account of their allowed claims against the Debtors' Estates.

49. The Preferential Transfers were made on or within ninety (90) days of the Petition Date.

50. The Preferential Transfers enabled Morgan Stanley to receive more than it would receive if (a) Alchemy's case were under Chapter 7 of the Bankruptcy Code, (b) the Preferential Transfers had not been made, and (c) Morgan Stanley received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

51. Morgan Stanley was either the initial transferee of the Preferential Transfers, the entity for whose benefit the Preferential Transfers were made, or was the immediate or mediate transferee of the initial transferee receiving the Preferential Transfers.

52. By reason of the foregoing, the Preferential Transfers should be avoided and set aside as a preferential transfer pursuant to Section 547(b) of the Bankruptcy Code.

53. Morgan Stanley was the initial transferee of the Preferential Transfers, the immediate or mediate transferee of such initial transferee, or the person for whose benefit the Preferential Transfers were made.

54. Pursuant to Section 550(a) of the Bankruptcy Code, the Trustee is entitled to recover from Morgan Stanley an amount to be determined at trial that is not less than the total amount of the Preferential Transfers, plus interest thereon to the date of payment and the costs of this action.

## FOURTH CLAIM - ACCOUNTING

55. The preceding paragraphs are incorporated by reference, as if fully set forth herein.

56. Alchemy and Morgan Stanley are parties to an engagement letter dated June 1, 2016.

57. The engagement letter provided for Alchemy to make the Expense Deposit and Supplemental Deposits totaling $125,000.

11

58. The Trustee accordingly seeks an immediate accounting from Morgan Stanley of any and all Expense Deposits and Supplemental Deposits to determine if any excess expense deposits should be turned over to the Trustee.

## VI. RELIEF REQUESTED

WHEREFORE, Plaintiff George L. Miller, Chapter 7 Trustee for the jointly administered estates of Our Alchemy, LLC and Anderson Digital, LLC, demands judgment in his favor and against Morgan Stanley:

(a) For avoidance and recovery of the fraudulent and/or preferential Transfers, or the value thereof;

(b) Directing Morgan Stanley to immediately pay the Trustee the amount of the Transfers, plus interest thereon and costs, and, in connection therewith, enter judgment in favor of the Trustee and against Morgan Stanley;

(c) Directing Morgan Stanley to provide the Trustee with an accounting of the Expense Deposits and Supplemental Deposits;

(d) Reasonable attorneys' fees and costs; and

(e) Such additional relief as this Court deems just.

## VII. JURY DEMAND

The Trustee demands a jury trial before an Article III Judge in connection with all claims asserted herein.

<table>
<tr><td>Date: June 29, 2018</td><td>**BIELLI & KLAUDER, LLC**<br><br>*/s/ David M. Klauder*<br>David M. Klauder (No. 5769)<br>1204 N. King Street<br>Wilmington, DE 19801<br>Phone: (302) 803-4600<br>Fax: (302) 397-2558<br>dklauder@bk-legal.com<br><br>*Special Counsel for Plaintiff George L. Miller, Chapter 7 Trustee*</td></tr>
</table>